AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br>The Safe Deposit Box belonging to SANG WON<br>LEE, Self Service Box #039 according to Comerica<br>Bank, located at Comerica Bank branch 574, 635 S.<br>Hobart Boulevard Suite B, Los Angeles, CA 90005. | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No.  2:21-MJ-04681 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-4*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349 | Wire fraud and wire fraud conspiracy |
| 18 U.S.C. § 1956 | Money laundering |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts: *See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA Kelly Sullivan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

The Honorable Charles F. Eick
*Printed name and title*

AUSA: JMC (213-894-6520)

## ATTACHMENT A-4

**PREMISES TO BE SEARCHED**

The Safe Deposit Box belonging to SANG WON LEE, Self Service Box #039 according to Comerica Bank ("LEE'S SAFE DEPOSIT BOX"), located at Comerica Bank branch 574, 635 S. Hobart Boulevard Suite B, Los Angeles, CA 90005).

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 and 1349, wire fraud and conspiracy to commit the same, 18 U.S.C. § 1956, money laundering, and 18 U.S.C. § 371 conspiracy to commit an offense, namely Title 18 U.S.C. § 1073, unlawful flight to avoid prosecution (the "Subject Offenses"), namely (with a date range of January 1, 2016 to present):

a.    Data, records, documents, letters, correspondence, communications or other information (including electronic mail, text and voice messages via phone, encrypted application or any other electronic means) pertaining to facilitating the flight of, payment for services for assistance in the flight of, and exoneration of the bond for:

i.    In-Kwon CHOI,

ii.   June Yong KIM,

iii.  JU LEE, or

iv.   Any other individuals LEE or OK Bail Bond assisted in leaving the United States;

b.    Data, records, documents, letters, correspondence, communications or other information (including electronic mail, text and voice messages via phone, encrypted application or any other electronic means) pertaining discussions regarding the movement of money for, and logistical information regarding the movement of money for:

i.    JU LEE

ii.   YONG LEE

1

iii. Any other individuals involved in the alleged embezzlement carried out by JU LEE or the provision and later movement money (either related or unrelated to the bail money) for JU LEE;

c. Bail files (hard copy or electronic) regarding any individuals for whom LEE or OK Bail Bond sought exoneration via 1305(g) motion, including but not limited to those files regarding In-Kwon CHOI and June Yong KIM;

d. Bookkeeping records, ledgers, pay/owes, promissory notes, and any and all other documents (hard copy or electronic) which show:

i. The movement of money (including via cash, wire, check, hawala or any other means) between LEE and/or OK Bail Bond and anyone else, including but not limited to In Kwon CHOI, relatives of CHOI, June Yong KIM, relatives of KIM, Keith Kim, "Chairman Kim," Richard Je Kim aka Jae-Shik Kim (or Jae-sik Kim), "Mr. Kim," Ron Kim, JU LEE, YONG LEE, Reliance Investments, JLAD Inc., Go Textile International Inc., Dong-Jin Choi, and OK Finance,

ii. The identities of anyone moving or storing money for LEE, including within the United States, within South Korea, between the two, or crossing any other state or foreign lines,

iii. Payments made to LEE, OK Bail Bond, OK Finance, Dong-Jin Choi or others in support of the bail scheme either in the United States or in any other country,

iv. Payments made to LEE or Keith Kim by JU LEE, YONG LEE, and any related companies or individuals;

2

e. Documents, cards, checks or other items which would serve to identify bank accounts utilized by LEE and/or OK Bail Bond in the United States, especially outside of the known institutions (Comerica Bank, Pacific City Bank, JP Morgan Chase Bank);

f. Documents, keys or other items which would serve to identify other Safe Deposit Boxes owned/controlled by LEE and/or OK Bail Bond not previously noted;

g. Documents (hard copy or electronic) which identify bank accounts in Korea which LEE has used to move or store money;

h. U.S. currency in excess of $1,000, including the first $1,000 if more than $1,000 is recovered, bearer instruments worth over $1,000 (including cashier's checks and traveler's checks);

i. Documents, receipts, or any other evidence of travel out of the United States by LEE, KIM, CHOI or any other OK Bail Bond employees or arrestees bailed out by OK Bail Bond;

j. Keys to the TARGET SAFE DEPOSIT BOX for use in facilitating the search of said box;

k. Contents of any calendar or date book stored on any of the digital devices;

l. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations with respect to travel to Mexico or South Korea;

m. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

3

1   show address book information, including all stored or saved

2   telephone numbers;

3            n.   Records, documents, programs, applications and

4   materials, or evidence of the absence of same, sufficient to

5   show call log information, including all telephone numbers

6   dialed from any of the digital devices and all telephone numbers

7   accessed through any push-to-talk functions, as well as all

8   received or missed incoming calls;

9            o.   Records, documents, programs, applications or

10  materials, or evidence of the absence of same, sufficient to

11  show SMS text, email communications or other text or written

12  communications sent to or received from any of the digital

13  devices and which relate to the Subject Offenses;

14           p.   Records, documents, programs, applications or

15  materials, or evidence of the absence of same, sufficient to

16  show instant and social media messages (such as KakaoTalk,

17  Facebook, Facebook Messenger, Snapchat, FaceTime, Skype,

18  WhatsApp, and WeChat), SMS text, email communications, or other

19  text or written communications sent to or received from any

20  digital device and which relate to the Subject Offenses;

21           q.   Any digital device which is itself or which

22  contains evidence, contraband, fruits, or instrumentalities of

23  the Subject Offenses, and forensic copies thereof.

24           r.   With respect to any digital device containing

25  evidence falling within the scope of the foregoing categories of

26  items to be seized:

27                i.   Evidence of who used, owned, or controlled

28  the device at the time the things described in this warrant were

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, v browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. Evidence of the attachment of other devices;

iv.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   Evidence of the times the device was used;

vi.   Passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device; applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

vii. Records of or information about Internet Protocol addresses used by the device;

viii.    Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s)

thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items

to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

d.    If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

f.    If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

g.    The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress LEE's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of LEE's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Kelly M. Sullivan, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice.  I have been an SA since 2008 and am currently assigned to a white collar crime squad.  Since becoming an SA, I have investigated a variety of white collar crimes including financial institution fraud, health care fraud, money laundering and other related criminal offenses, as well as national security matters.  The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observation and experience, as well as information obtained from other law enforcement personnel.  This affidavit is offered for the sole purpose of establishing probable cause for the issuance of the requested search warrant and does not purport to set forth all of the facts I have learned during the course of the investigation.

## II.   PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a search warrant for the person, cellular telephone, residence of, and the safe deposit box of SANG WON LEE ("LEE"), and the offices of OK BAIL BOND, which is a business operated by LEE, for evidence of violations of Title 18, United States Code, Sections 1343 and 1349, wire fraud and conspiracy to commit wire fraud, Title 18, United States Code, Section 1956, money laundering, and Title 18, United States Code, Section 371, conspiracy to commit an

1

offense, namely Title 18 United States Code 1073, unlawful flight to avoid prosecution (collectively, the "SUBJECT OFFENSES").

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

**III.** **INDIVIDUAL AND PREMISES TO BE SEARCHED**

4.    The individual and premises to be searched are as follows, and are also detailed in Attachments A-1 through A-5, which are incorporated fully by reference herein:

a.    The person of LEE, date of birth January 31, 1957, approximately 5 feet 7 inches tall, approximately 150 pounds, with a thin build and typically wearing glasses.

b.    951 Westchester Place, Los Angeles, CA 90019 ("LEE'S RESIDENCE").

c.    A 2014 White Mercedes GL-Class (SUV) with California license plate 7DHG342 ("LEE'S VEHICLE").

d.    OK BAIL BOND, located at 2717 W. Olympic Boulevard #204, Los Angeles, CA 90006.  OK BAIL BOND is located on the second floor of an outdoor strip mall on the north side of W. Olympic Boulevard in unit 204.

e.   A Safe Deposit Box belonging to LEE, Self Service Box #039 ("LEE'S SAFE DEPOSIT BOX"), located at Comerica Bank branch 574, located at 635 S. Hobart Boulevard Suite B, Los Angeles, CA 90005.

## IV.  ITEMS TO BE SEIZED

5.   Based on the below, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of the SUBJECT OFFENSES, will be found during the search of the LEE, LEE'S RESIDENCE, LEE'S VEHICLE, OK BAIL BOND and LEE'S SAFE DEPOSIT BOX.

## V.  SUMMARY OF PROBABLE CAUSE

### A.   OVERVIEW OF THE BAIL SCHEME

6.   As set forth below, this affidavit describes LEE's suspected fraudulent bail scheme.  Specifically, LEE, a registered bail agent, conspired with individuals arrested in the United States to assist those individuals in fleeing the country to evade criminal responsibility in return for a fee and with an agreement that LEE would be able to keep the significant bail money that the individuals provided to LEE as collateral, that he in turn posted on behalf of these individuals.  LEE would then continue to conspire with those individuals to meet in a foreign country, namely, South Korea, from which they would not be extradited, in order to create the circumstances necessary for LEE to file motions to have the forfeited bail for those arrestees exonerated by the court, allowing LEE to collect that bail money.  As described further below, the evidence collected includes LEE's own statements, in which he described

his scheme in detail and described performing the scheme in the past, a Confidential Human Source, bank records, which show a funneling of money between LEE and customers, and various court filings, which support that LEE was engaged in such a scheme.

7.   In summary, the bail scheme worked in the following manner:

a.   LEE, in the course of his business, would be approached by individuals in need of bail.  LEE would evaluate these individuals to determine two things – whether the crime for which the individual had been arrested was serious enough that he could convince the individual (sometimes with the assistance of his friend, Attorney K.K.) that the individual was facing significant jail time, but that the crime for which the individual had been arrested was also not likely to warrant extradition back to the United States from South Korea.

b.   LEE would then advise the individual he could assist him/her in fleeing the United States after bailing him/her out, and negotiate a price for this service.

i.   Many times this price would be equal to the bail amount, plus fees that would cover LEE's flights and lodging in South Korea and any other expenses that might be incurred.  The fee of the entire bail amount appears logical, because if the scheme did not work and LEE ultimately had to forfeit the bail, he would either have to make a claim to his Surety company or pay the money out of pocket.  He may not want to have the Surety company pay out, lest they discover the scheme.

4

ii.   The money would be secured either in South Korea, typically from family or friends of the arrestee, or in the United States.  LEE had a financial company in South Korea called OK Finance, run by Dong Jin Choi, who would secure the collateral (cash/wire/real estate/etc.).

c.   LEE would then assist the individual in fleeing the country, typically by driving him/her down into Mexico and getting him/her on an international flight to Asia with an ultimate destination of South Korea.

d.   Once the individual fled, LEE would wait for several weeks or months until the individual forfeited the bail by failing to appear in court in the United States.

e.   LEE would then travel to South Korea, ostensibly in order to find the individual who fled.  In reality, LEE would already be in contact with this individual, and would arrange to meet them in South Korea.  LEE would then present the individual for extradition.

i.   Because LEE already knew the crime likely would not warrant extradition, this part of the scheme was necessary in order to provide the agency which charged the individual the chance to extradite, which is a necessary step toward having bail exonerated.

f.   If/when the agency responsible for the charges refused extradition, LEE would then hire an attorney to make a 1305(g) motion to the court to exonerate the bail.

i.   California Penal Code Part 2, Title 10, Chapter 1 details the specifics of Bail, and in Article 7, Section 1305(g) reads as follows:

"In all cases of forfeiture where a defendant is not in custody and is beyond the jurisdiction of the state, is temporarily detained, by the bail agent, in the presence of a local law enforcement officer of the jurisdiction in which the defendant is located, and is positively identified by that law enforcement officer as the wanted defendant in an affidavit signed under penalty of perjury, and the prosecuting agency elects not to seek extradition after being informed of the location of the defendant, the court shall vacate the forfeiture and exonerate the bond on terms that are just and do not exceed the terms imposed in similar situations with respect to other forms of pretrial release."

g.   When the bail was exonerated in successful schemes, LEE would keep the money as part of his fee for assisting the individual in fleeing the country and avoiding the California jail system.

**B.    BACKGROUND ON THE SOURCES OF INFORMATION**

8.   This investigation was opened based on reporting from a Confidential Human Source, who had provided reliable information in the past on a separate matter, and who reported the basics of this bail scheme as described below.  This Confidential Human Source had first-hand knowledge of the scheme, as he/she used to work for LEE and is also a relative of LEE, had seen the scheme in action, and had participated in the scheme on one occasion.  The details of this scheme were compiled from the reporting of the Confidential Human Source (particularly the basics of and reasoning behind the scheme), along with bank records, court records, travel records, and audio/video, audio and encrypted messaging app chat files provided by the Confidential Human Source (detailed summary

1   translations were performed by FBI Linguists) which corroborated

2   a large portion of the Confidential Human Source's reporting.[1]

3           a.   The Confidential Human Source had direct access

4   to LEE and the business and files of OK BAIL BOND until

5   on/around October 31, 2018.  The Confidential Human Source and

6   LEE had a falling out at that time, and parted ways

7   acrimoniously.  Subsequent to the falling out, LEE initiated a

8   civil lawsuit against the Confidential Human Source, the

9   Confidential Human Source countersued.  The civil lawsuit

10  between the two parties is still in process.

11          b.   While working at OK BAIL BOND, the Confidential

12  Human Source stated he/she put up surveillance cameras (audio

13  and video) with LEE's knowledge and approval and put up signs to

14  inform those in the business office that recording was

15  happening.  The Confidential Human Source maintained and had

16  access to the equipment and recordings, and made copies of the

---

18  [1] The Confidential Human Source was opened briefly by the
19  FBI in October 2005 in relation to a Political Corruption case
    and to provide information on counterfeiting in the Koreatown
20  area of Los Angeles.  The Confidential Human Source reported on
    the employment of some illegal aliens.  On May 5, 2007 there was
21  an incident at his/her store where some of his/her employees
    were arrested for selling counterfeit goods.  He/she bailed them
22  out and insisted he/she did not sell counterfeit goods at
    his/her store.  The Confidential Human Source was ultimately
23  closed in February 2008 due to lack of productivity with only
    four reports made over those years.

24      The Confidential Human Source was opened by me in October
    2020 after he/she called the FBI to report that an FBI subject
25  whose residence the FBI had just searched (a search with which I
    was involved) called the Confidential Human Source and came to
26  the former OK Bail Bond office for advice after the search.  The
    Confidential Human Source provided the FBI with information
27  regarding that subject.  During subsequent meetings, the
    Confidential Human Source reported LEE's bail bond scheme to me,
28  and after initial corroboration of some of the Confidential
    Human Source's information, I initiated an investigation.

                                    7

recordings that he/she provided to me from that system.  When the Confidential Human Source made these copies, it was not at the direction of law enforcement and took place before we ever met.  The Confidential Human Source stated he/she made copies of the recordings provided to me in support of his/her aforementioned lawsuit.  I personally viewed the signage at the former OK BAIL BOND office in/around March 2021.  The signage was adjacent to LEE's former desk facing into the office space and read, "WARNING VIDEO & AUDIO SURVEILANCE IN PROGRESS."  The sign was clearly visible from the entrance to the office, as well as when sitting in front of LEE's desk.[2]

c.   While working at OK BAIL BOND as well as after he/she left, the Confidential Human Source maintained contact with employee P.K., who is seen and heard in many of the recordings provided to me by the Confidential Human Source. P.K. made several recordings of conversations and calls with LEE and provided them to the Confidential Human Source, who later provided them to me.  P.K. also provided the Confidential Human Source with copies of his KakaoTalk chat chain with LEE, which the Confidential Human Source later provided to me.  All of the recordings and chat downloads mentioned above were obtained by the Confidential Human Source prior to meeting me.

C.   **CONFIDENTIAL HUMAN SOURCE REPORTING ON FLOW OF MONEY**

9.   The Confidential Human Source reported most of the money transfers involved in the bail scheme might be difficult to locate as most of the money did not flow through financial

---

[2] This desk was the desk at which the conversation detailed below in the probable cause section was recorded.

institutions in the United States.  LEE used his company in South Korea called "OK Finance" and his Manager Dong Jin Choi, and the Confidential Human Source provided information for this company.[3]

10.  The Confidential Human Source explained that LEE did not want records of money transfers into the United States as that could potentially be traced and may have tax implications. The Confidential Human Source stated LEE had an informal transfer system in place utilizing people both in South Korea as well as the United States who would assist him in conducting underground money transfers.  I recognized the informal system as a hawala-style banking system (the Confidential Human Source did not use this specific terminology, but I will use it here in order to describe accurately the transfer process).  The Confidential Human Source identified this system as follows:

a.  As mentioned above, OK Finance and Dong Jin Choi operated as the South Korean arm of this hawala system.

b.  The Confidential Human Source stated he/she had personally received cash destined for LEE from two identified individuals in the United States, referred to by LEE and P.K. in

---

[3] The Confidential Human Source provided documents from an OK Bail Bond bail file on an individual named Yuna Yang.  This individual was not involved in any of the alleged offenses, but the file contained the information regarding Dong Jin Choi noted below for identification purposes and corroboration of the Confidential Human Source's statement that collateral for some arrestees was transferred in Korea to OK Finance.  OK Finance Manager Dong Jin Choi, Address Seoul, Gwanak-gu, Shinrim-dong, 1700 Life Apartment #1410, Korean ID 570311-1345415, is noted in the Yuna Yang file as OK Bail Bond's Korean representative.

As can be seen in this document, the collateral for the bail for Yuna Yang was to be transferred in South Korea to OK Finance and Choi.  The Confidential Human Source said this happened regularly.

KakaoTalk messages as "Mr. Kim" and "Chairman Kim."  Chairman Kim is also referred to by LEE and P.K. as Jae-Shik Kim.

        i.   The Confidential Human Source provided me with a phone number and text messages in Korean with "Chairman Kim."

        ii.   The Confidential Human Source provided me with a drop phone number, name and employment of Mr. Kim.

    c.   The Confidential Human Source thought LEE had other individuals help him move money, and stated LEE had also brought cash back from South Korea.

**VI.   STATEMENT OF PROBABLE CAUSE**

    11.   Below are two instances where there is probable cause that LEE had gone through with his bail scheme, both assisting these individuals in fleeing the country, as well as defrauding the Los Angeles County Court system of the bail money owed if not for the fraudulent filing of 1305(g) motions.

    **A.   SCHEME RELATED TO LEE AND IN-KWON CHOI ("CHOI")**

    12.   In-Kwon Choi ("CHOI") (born 1968), allegedly committed the crimes of 487(D)(1) (grand theft auto) and 532A(1) (false statements in support of a loan) on or about March 19, 2009 according to court records, but was not arrested until approximately December 5, 2017, after his return to the United States.  CHOI's bail was set at $55,000 and was posted by OK BAIL BOND on December 14, 2018.

    a.   The Confidential Human Source reported CHOI's mother, who was in South Korea, transferred $55,000 to OK Financial, and that OK Financial assisted in transferring the money to the United States.

13. My review of the Electronic Docket for Case Number KA089070, The People of the State of California vs. In Kwon CHOI, noted the following events of significance after CHOI's arrest:

a.   January 5, 2018:  Arraignment – CHOI present in court with attorney K.K., matter continued, bail to stand.

b.   February 7, 2018:  Arraignment and plea – CHOI present in court with attorney K.K., not guilty pleas entered, matter continued for pre-preliminary hearing, bail to stand.

c.   February 26, 2018:  Pre-preliminary hearing – CHOI present in court with attorney K.K., hearing continued to be heard with CHOI's felony Norwalk case, bail to stand.

d.   March 9, 2018:  Pre-preliminary hearing – CHOI not present in court but represented by K.K., bond is forfeited, bench warrant issued for $600,000.

e.   June 22, 2018:  Bail/Bond motion filed, notice of motion and motion to vacate forfeiture and exonerate bail bond.

f.   September 14, 2018:  Demand notice on forfeited bond issued.

g.   April 26, 2019:  Case called for motion to vacate bail/bond forfeiture, bail/bond was vacated, reinstated and exonerated.  Attorney B.P. appeared on behalf of bail agency and surety.

14. The Confidential Human Source stated he/she was present in the OK BAIL BOND office when attorney K.K. was meeting with CHOI at the office, and LEE was present via telephone as he was in South Korea at the time.  LEE worked with attorney K.K. to convince CHOI to flee versus spending the time

11

and money to fight the allegations.  The Confidential Human Source provided a photo of CHOI taken in the OK BAIL BOND office.[4]

       a.   Travel records, which I have reviewed, confirmed LEE was in South Korea from approximately February 4, 2018 to April 28, 2018, which is consistent with the reporting.

15.  The Confidential Human Source stated he/she had participated in this instance of the scheme by driving CHOI down into Mexico, at the direction of LEE who was in South Korea at the time, so he could fly out of the Tijuana Airport.

       a.   Travel records confirmed the Confidential Human Source crossed back into the United States at the San Ysidro land border crossing on March 9, 2018.  Travel records for CHOI show his travel into the United States (from Incheon to Los Angeles International Airport (LAX)) on December 5, 2017, with no subsequent travel out of the United States.

       b.   Court records show CHOI's bail was forfeited on March 9, 2018.

16.  The Confidential Human Source provided an audio file of a recording between P.K. (an OK BAIL BOND employee) and LEE regarding CHOI, which took place on March 10, 2018 (the call was conducted in Korean and a summary translation was performed by an FBI Linguist).  In the call, P.K. informed LEE that a $20,000 transfer is complete and that he got confirmation from Dong Jin Choi as well.

---

[4] OK BAIL BOND used to be located at 1101 South Vermont Avenue, Suite 201, Los Angeles, CA 90006, prior to moving to the current address as noted in this affidavit.  For both this and the next example, OK BAIL BOND was at the 1101 Vermont location.

17.   The Confidential Human Source also provided two KakaoTalk message chains between LEE and P.K. (received from P.K., also conducted in Korean with a detailed summary translation performed by an FBI Linguist).  The following facts are taken and summarized from these message chains, and the Confidential Human Source provided clarification as noted:

a.   LEE and P.K. had continual discussions between March 2018 and July 2018 regarding LEE's attempts to call CHOI and his family members in Korea.  Based on my training and experience, as well as in speaking with an Investigator from the California Department of Insurance, the fact that LEE and P.K. thought they could get in touch with CHOI simply by calling him implied they expected to maintain contact; if CHOI had legitimately fled, there would be no expectation on behalf of a bail agent that the individual would be in contact.

b.   In March 2018, LEE and P.K. also discussed receiving $9,000 from Mr. Kim and $20,000 from Chairman Kim Jae-shik.  LEE and P.K. discussed receiving $30,000 from Chariman Kim in April 2018.  The Confidential Human Source stated this was money related to the CHOI case.  Also in April 2018, P.K. discussed that another employee of OK BAIL BOND met with Chairman Jae-Shik Kim and received an additional $2,000 The employee to whom Paul was referring was the Confidential Human Source, who confirmed he/she had received cash from Chairman Kim as noted.

18.   On February 16, 2019, a check for $4,370 was written out of the Alleeance Services ("d/b/a OK Bail Bond") Pacific City Bank Account number 1431493 to [B.P.] with the memo line

"In Kwon Choi 1305g (2 cases)."  Open source searches confirmed attorney B.P. is an attorney with experience working in the bail industry.

19.  As noted previously, Los Angeles County Court records indicate the bail was exonerated on April 26, 2019 after several motions to vacate the bond.

20.  I obtained a partial copy of the 1305(g) motion filed by B.P. on behalf of American Contractors Indemnity Company (the surety) from the West Covina Courthouse (certain of the documents such as photographs and fingerprints are considered confidential by the court and were not immediately available for review).  Review of the 1305(g) motion for this case stated the surety had located CHOI in South Korea and transmitted this information to the Los Angeles County District Attorney's office, which did not pursue extradition.  Included as exhibits in the motion were declarations made by B.P. and LEE, the salient portions of which are as follows:

a.  In his declaration, B.P. stated the surety generated a package of documents while CHOI was in custody in South Korea, which included fingerprints, an identification affidavit by Chief Detective Myeong Suk Im, photographs of CHOI's identification and passport, and photographs of CHOI with LEE and Detective Im taken while CHOI was in custody.

i.  These documents and photographs were caused to be transmitted by LEE internationally from South Korea to the United States in support of his scheme.  The identity documents are factual, but they were transmitted by LEE in support of the larger fraud scheme which he orchestrated.

b.   In his declaration, LEE stated he flew to South Korea in late March (2018) to search for CHOI, after having attempted to contact him, and after having confirmed he was in South Korea through his contacts in the police force there.

i.   In reality, based on travel records, LEE had flown to South Korea on February 4, 2018, and no other notations of travel are in those records until his return to the United States on April 28, 2018.  LEE confirmed his return on April 28, 2018 in his declaration.

ii.   Confidential Human Source reporting as noted above indicated LEE had spoken with CHOI and attorney K.K. via phone from South Korea prior to the Confidential Human Source, at LEE's direction, driving CHOI to Mexico to leave the United States and travel to South Korea.

c.   LEE declared he flew to South Korea on May 24, 2018, and returned to the United States on August 18, 2018 without finding CHOI.  These dates are corroborated by travel records.

d.   LEE declared he flew back to South Korea on December 24, 2018 after police contacts informed him they had located CHOI.  He declared on January 3, 2019, he, Detective Im and two other detectives arrested CHOI and brought him to the U.S. Embassy.  The identification and photographic information was collected in order to enable the Los Angeles County District Attorney's office to evaluate the case for potential extradition.

i.   In line with what the Confidential Human Source reported, this timeline corroborates the likelihood that

15

CHOI initially reneged on his agreement with LEE and LEE had to put real effort into finding him.  However, this does not absolve LEE of the fact he orchestrated this scheme, to include CHOI's travel to South Korea, nor does it negate his original intention and ultimate success in assisting a felon (CHOI) in fleeing the country to avoid prosecution, and in defrauding the court system of righteously forfeited bail monies.

**B.   SCHEME RELATED TO LEE AND JUNE YONG KIM ("KIM")**

21.   June Yong KIM ("KIM") (born 1973), allegedly committed the crime of 487(A) (grand theft) on May 14, 2013 according to open source court records, but left the United States and was not arrested until September 19, 2018, upon his return to the United States.  KIM's bail was set at $45,000 and was posted by OK BAIL BOND on October 2, 2018.

22.   The Confidential Human Source provided information for this portion of the scheme, as follows:

a.   A CCTV internal audio/video surveillance video of the OK BAIL BOND office from October 2, 2018 (after KIM was bailed out) shows a discussion between KIM and LEE (P.K. is also present but had minimal participation).  In the video, LEE discussed KIM's situation and presented the idea of helping KIM flee the United States.  LEE convinced KIM to flee and ultimately settled on a price.  The following are the key points pulled from a transcript of the video:

i.   LEE told KIM the job of a bail bond company is not to let its clients ever go back to jail once they are released.  LEE recounted the story of assisting a student in the past (a son from a rich family) who had purchased a car using

16

someone else's identity and then sold the car and "took off." LEE stated he sent the guy back to Korea, without having him go through the process. He was supposed to serve at least three years otherwise for various frauds.

        ii.  KIM then asked LEE what do you mean when you said you sent him back to Korea, and LEE said "I have my way."

        iii. KIM inquired as to the cost. LEE asked if KIM was planning to come back to the States, and informed KIM that Korean law allows you to change your name. KIM asked if you can also get a brand new passport, and LEE said after that, the only thing that remains is your fingerprints.

        iv.  KIM objected, saying when they grant you a passport in Korea, everything has to match with his record, and asks how do you change your name then?

        v.  LEE bragged about two individuals he helped leave the United States, and KIM responds, "OK, let's summarize. You are telling me that there is such a way." LEE said there is a way, and KIM asked how much it costs. KIM stated "If I don't come back and run my business in Korea via phone calls and emails…" and LEE responds, "Then you're fine."

        vi.  LEE mentioned there was an article in the newspaper recently, and asked KIM if he knows how many Koreans get extradited in a year. LEE appears to show KIM an article on his phone, and stated, "Look, '10 Korean fugitives in the last six years' in Korea Daily, see?"

        vii. LEE gave another example of a tenured professor from a good family, but who is bad. LEE said he could

have saved him, and could have made an arrangement so that he
will never be extradited, but he would not see LEE.

        viii.    LEE and KIM began discussing the amount
and how bail works, and how when someone shows up for court, the
bail money is returned.  LEE said, "But there are people who
give up on this and go to Korea anyway.  It's not like they are
fleeing.  It's more like I let them go."  KIM said he has a
question about this and asks how can you leave the country.  LEE
responded, "I don't know how many times I have to tell you.
Didn't I tell you over and over that I sent a hundred people?
Not a hundred.  Several hundreds."

        ix.  KIM asked, "So, give up $45,000?"  To which
LEE responded, "What's $45,000…there are people who go after
giving up one million dollars."  KIM stated "Then if you want to
go, you just pay and leave?"  LEE responded "But you wouldn't
know how to leave."  And KIM responded, "Exactly."

        x.  LEE told KIM about how he facilitates people
leaving through Mexico, and how he knows what route to take and
what to say so there are no questions.  LEE said they will go by
road to Mexico and that there will be travel expenses.  LEE said
an economy seat to Korea from Mexico via Tokyo is about $2,000.
LEE said "You cannot leave from LAX.  Never.  You can't leave
from Canada either."

        xi.  LEE then discussed the next steps, stating,
"Once you arrive in Korea, we can't meet right away, because
that looks like it was premeditated. . .  We have to wait about
three months, or two months at the earliest.  We need about two
month's time."

xii. KIM asked if he decides to do it, would LEE be willing to do it for $20,000.  KIM asks, "I will give you $20,000, and in return, can you find a way to do it safely and conveniently?"

xiii. KIM stated he would like to make the first appearance at least, in order to "check out the lawsuit."  He later stated, "So I have two choices.  Plan B is to go with you while Plan A is to go with my attorney.  I need to go on the 9th to see about Plan A, as to whether this will be dropped or continued.  If it's going to continue, how long it will take and what is my chance of winning or dropping the case.  I need to confirm with my attorney regarding this as soon as possible."[5]

xiv. Finally, KIM stated, "Okay, let's wrap up.  We already settled on fees of $20,000.  I will deposit $45,000 by today or tomorrow."  LEE insisted the money come today.  LEE said he can do the transfer within Korea or handle it in the United States.  The video ends with the exact transfer mechanism still undecided.

b.  The Confidential Human Source provided me with a copy of a check from Go Textile International Inc, 1214 E. 18th Street, Los Angeles, CA 90021 written on October 2, 2018 (the day of the conversation captured on the video referenced above) for $20,000 to OK Bail Bonds, with the memo line reading "Loan." He/she said this check was from KIM to cover part of the promised money.  Financial records obtained in the investigation

---

[5] According to the open source Los Angeles County Court records, KIM's first "Prelim setting/resetting" hearing took place on 10/09/2018.

confirm this check was deposited into the Alleeance Services (dba OK Bail Bond) Pacific City Bank Account number ending in 493 on October 17, 2018.

23.   An analysis of the Los Angeles County Court's Electronic Docket as compared with KIM's travel records showed he did go to some of his court appearances, but then decided to flee the country.  As KIM worded it in the video noted above, he looked into his "Plan A" (meaning, he went to some court appearances to see about the charges and confer with his lawyer) but opted for "Plan B" (specifically, fleeing the United States and cooperating with LEE in the bail scheme):

    a.   September 19, 2018:  KIM flew into LAX from Incheon Airport ("ICN") and was arrested.

    b.   September 20, 2018:  KIM was arraigned and was represented by attorney K.K.  He pleaded not guilty and was remanded to custody.

    c.   October 2, 2018:  KIM was bailed out by LEE and OK BAIL BOND.

    d.   October 9, 2018:  Case called for preliminary hearing setting, KIM was present with his attorney (minutes state "[K.K.] private counsel appearing by Edward Blum"), preliminary hearing set, bail to stand.

    e.   October 30, 2018:  Case called for preliminary hearing setting, KIM was present with his attorney K.K., matter continued for a further preliminary hearing setting, bail to stand.

f.   November 2, 2018:  Case called for further proceedings, KIM was not present but was represented by attorney K.K., bail to stand.

g.   November 7, 2018:  KIM flew to ICN from LAX.

h.   November 30, 2018:  KIM returned from ICN to LAX.

i.   December 4, 2018:  Case called for preliminary setting/resetting, KIM is present in court and represented by attorney K.K., matter continued for preliminary hearing, no further continuances will be granted, bail to stand.

j.   December 5, 2018:  KIM flew to ICN from LAX.

k.   January 14, 2019:  KIM returned from ICN to LAX.

l.   January 16, 2019:  Case called for preliminary hearing, KIM is present in court and represented by attorney K.K., next appearance set for March 13, 2019.

m.   January 17, 2019:  KIM flew out of LAX to ICN for the last time and has not returned to the United States (at least using his true name and identification).

n.   March 13, 2019:  Case called for preliminary setting/resetting, KIM failed to appear but was represented by K.K.  Bail order was forfeited and a bench warrant issued for $200,000.  Bail forfeiture notice printed the same day and was mailed to the surety and agency the next day, stating the 185th day is September 15, 2019.

o.   September 16, 2019:  Case called for bail/bond motion filed, hearing set for motion to vacate bail/bond forfeiture.

p.   September 18, 2019:  The court issued a demand notice.  A copy of this notice was provided to me by the

Confidential Human Source and was noted as mailed on September 18, 2019.

       q. October 4, 2019:  Case called for bail/bond motion, B.P. present and appearing on behalf of the bail agency and surety, motion to vacate forfeiture and exonerate bail is granted.

    24.  On August 24, 2018, a check for $2,935 was written out of the Alleeance Services (d/b/a OK Bail Bond) Pacific City Bank Account number ending in -493 to B.P. with the memo line "1305g – June Yong Kim."

    25.  I obtained a partial copy of the 1305(g) motion filed by B.P. on behalf of American Contractors Indemnity Company (the surety).  Review of the 1305(g) motion for this case stated the surety had located KIM in South Korea and transmitted this information to the Los Angeles County District Attorney's office, which did not pursue extradition.  Included as an exhibit in the motion was a declaration made by LEE, the salient portions of which are as follows:

       a.  LEE described in his declaration attempting to contact and locate KIM after he failed to appear, to include contacting attorney K.K.  LEE indicated friction between himself and attorney K.K. about a lack of communication about KIM's failure to appear.

       i.  LEE's account of being upset at attorney K.K. is belied by his recorded conversation with KIM wherein LEE describes and convinces KIM to participate in the scheme.

       b.  LEE declared he had found out through the Korea Immigration Service Office that KIM's final departure for South

22

Korea was on January 17, 2019, which is corroborated by my review of KIM's travel records.

        c.  LEE stated the Seoul Police Department informed him of KIM's addresses on May 13, 2019, but could not locate him. LEE said the investigator eventually told him KIM would be returning to Seoul from Jeju Island on June 17, 2019, so LEE flew to Seoul on that day. Review of LEE's travel records corroborated this timeframe with a documented flight to Incheon on June 18, 2019.

        d.  In LEE's declaration, he stated he worked with Seoul detectives on June 20, 2019 to take KIM's fingerprints, photograph KIM's identification and passport, and photograph KIM alongside LEE and the detectives. LEE then took KIM to the US Embassy in South Korea. The information was gathered for the purpose of enabling the Los Angeles District Attorney's office to evaluate this case and KIM's accompanying case for potential extradition.

        i.  These documents and photographs were caused to be transmitted by LEE internationally from South Korea to the United States in support of his scheme. The identity documents are factual, but were transmitted by LEE in support of the larger fraud scheme which he orchestrated.

    **C.**  **ADDITIONAL WIRE FRAUD AND MONEY LAUNDERING**

    26.  Based on the modus operandi exhibited by LEE as detailed above, as reported by a Confidential Human Source, and as evidenced in the two specific instances of CHOI and KIM noted above, I believe, based on bank records related to LEE and OK BAIL BOND, that LEE initiated a similar scheme after the arrest

of an individual named Ju Hee Lee ("JU LEE") on or about November 4, 2020.  After her arrest, JU LEE was released when the arresting agency decided not to file charges at that time. Due to her release without charges, the bail was legally exonerated, but LEE then assisted JU LEE in moving the large amount of money she extorted from her employer that she had used for her bail to Korea, to which she had fled.  The evidence in support of this conclusion is detailed below.

27.  Review of the Alleeance Services bank accounts showed a large amount of money coming in from an individual named YONG LEE and a company called Reliance Investments, which, based on open-source research and the common address of 67 Nieto Place, Buena Park, CA 90621, was owned by YONG LEE.  Deposits totaling $801,140 made via wire and cashier's check to the OK Bail Bond Pacific City Bank Account ending in -493 between November 4, 2020 and November 9, 2020 could all be directly connected to YONG LEE and JU LEE based on the wire records or the name of the remitter on multiple cashier's checks and money orders.  A majority of these funds were then transferred to attorney K.K., with a percentage wired to Bail USA Inc (a bail bond underwriting company).  K.K. then moved $400,000 of this money to Dong-Jin Choi with OK Finance.  A flow chart illustrating these transfers is included as Exhibit 1, and is incorporated herein by reference.

28.  Further record gathering showed all the funds transmitted by YONG LEE appeared to originate from JU LEE or a company called JLAD (based on the remitter notation on the money orders and cashier's checks).  Open-source searches showed JLAD,

Inc. was incorporated by JU LEE.  In addition, the funds JU LEE embezzled from her company were wired to JLAD, Inc.

29.  Based on discussions with both the handling Buena Park Police Department Detective as well as the Orange County District Attorney Investigator, the total embezzlement was initially reported at approximately $2M, but the amount is suspected of rising to over $6M after investigation.  Buena Park Police Department made an arrest of JU LEE on November 4, 2020, and her bail was set at $2,064,000.  OK BAIL BOND posted the bail for JU LEE on November 10, 2020.  Buena Park Police Department did not have enough evidence at the time to file charges within the required timeframe, so JU LEE was released and the bail was exonerated legally for that reason.  Buena Park Police Department and Orange County District Attorney Investigators continued investigating, and attempted an arrest in early 2021, however, JU LEE had already fled the country on or about March 6, 2021, along with YONG LEE, and neither have returned.  The Orange County District Attorney Investigator has issued an arrest warrant for JU LEE in the amount of $6,318,395.

30.  On February 26, 2021, slightly over a week before JU LEE fled, a check in the amount of $541,140.00, payable to the Law Offices of [K.K.], was drawn from LEE'S Alleeance Service Group Inc. d/b/a Ok Bail Bonds Pacific City Bank account and posted to the Law Offices of [K.K.] Bank of Hope account. Finally, on March 12, 2021, an outgoing wire transfer, in the amount of $400,000.00, payable to Dong-Jin Choi with Ok Finance, was drawn from the Law Offices of [K.K.] Bank of Hope account.

31.  When LEE bailed out JU LEE, he knew or should have known she was arrested on embezzlement charges; however, this did not stop him from assisting JU LEE in transferring a large sum of money ($400,000) to South Korea through attorney K.K. at the time she was fleeing the country.  When the bail was exonerated on February 19, 2021, LEE could and should have returned the money that was due to JU LEE at that time; instead, he held the money in the weeks before JU LEE fled, and then transferred $541,140 to K.K. (deposited on/around February 26, 2021), who then wired $400,000 to Dong-Jin Choi with OK Finance on March 12, 2021.  I believe this money was destined for JU LEE and/or YONG LEE in South Korea.  Based on the timing, both LEE and possibly K.K. knew JU LEE was fleeing the country, and helped her get at least $400,000 out of the United States to South Korea.  In addition, because the amount was substantially less than the amount JU LEE transferred to LEE's Alleeance Services account through various means, I believe some of the money was kept by LEE and/or K.K. as a fee for assisting with this transfer of money out of the country.

**VII. PROBABLE CAUSE TO BELIEVE ITEMS TO BE SEIZED ARE LOCATED AT OR ON THE INDIVIDUAL AND PREMESES TO BE SEARCHED**

**A.    TRAINING AND EXPERIENCE**

32.  Based on my training and experience, I know the following:

a. Individuals involved in fraud schemes and money laundering may keep evidence of their schemes, such as contact information for their co-conspirators and ledgers of individuals and amounts paid or owed in order to keep the scheme going.

These individuals often keep the proceeds in the form of cash to make their crime harder to detect, as well as work around the Western banking system in order to avoid any bank records which would be available to law enforcement or tax agencies. Typically, they maintain all this evidence where it is close at hand and safe, such as in their residences, businesses, vehicles, and digital devices (which are also commonly stored in their residences and vehicles).  In this case, a self-access safe deposit box such as the one maintained by LEE, of which the bank does not keep track nor does it maintain access records, would also be a good place to keep such evidence.  Such individuals commonly maintain multiple cellular telephones to compartmentalize their contacts, and communicate with their fellow participants by phone, email, and text messages, and primarily utilize peer-to-peer encrypted applications which can transmit and store text messages as well as transmit voice calls.

          b. As set forth above, in the course of investigation, I have reviewed KakaoTalk chats.  Based on my training and experience, I am aware that KakaoTalk touts itself as an easy, no-cost, multifaceted messaging application which allows users to send messages, photos, videos and voice notes, and which uses an internet connection (LTE or Wi-Fi) for calls and messaging. I know that individuals who commit crimes with the aid of electronic devices do not always readily discard them, as computers, tablets and cell phones are expensive items that are typically used for years before being upgraded or discarded. Computers, tablets and cell phones can be used to communicate

between co-conspirators and may contain information relating to the crimes under investigation.

**B.   INDIVIDUAL AND PREMISES TO BE SEARCHED**

33.   On September 20, 2021, I observed an individual matching the description of LEE leave LEE'S RESIDENCE in LEE'S VEHICLE and drive to OK BAIL BOND and open OK BAIL BOND.  Later, on September 24, 2021 and September 29, 2021, surveillance specialists with the FBI observed LEE (positively identified via direct observation) leave the LEE'S RESIDENCE in the LEE'S VEHICLE and drive to OK BAIL BOND, retrieve the mail from OK BAIL BOND mailbox on one of the occasions, and go into OK BAIL BOND.  On September 29, 2021, LEE was also observed riding a bicycle, which appeared to have been stored at OK BAIL BOND, from OK BAIL BOND to a nearby restaurant. Finally, on September 30, 2021 and October 1, 2021, LEE was observed leaving LEE'S RESIDENCE, getting in the LEE'S VEHICLE and driving to various places.

34.   There is probable cause to believe that each of the premises to be searched will reveal relevant evidence.

a.   As to LEE's person, as noted above, based on my training and experience, I know people regularly keep their digital devices on their person.  People also keep important keys (such as safe deposit box keys, office keys and house keys) on their persons, as well as wallets which may contain evidence of previously unknown bank accounts.  All of these items are items to be seized, digital devices to be searched, or are access items which will assist me in searching other locations

without causing damage (such as safe deposit box, residence and business keys).

        b.  With respect to LEE's digital devices, including but not limited to LEE's cellular telephone (phone number 213-369-9797), as detailed in the affidavit above as well as in my training and experience, LEE utilizes the KakaoTalk app to conduct business related to OK BAIL BOND.  There is already evidence in my possession that he utilized the KakaoTalk app to discuss particulars with respect to the CHOI case.  KakaoTalk information is stored on the phone of the user of the app, and this information is not retrievable via other means available to me.  Communications between LEE and his co-conspirators (the individuals he assisted in fleeing the United States, attorney K.K., Dong-Jin Choi, JU LEE, YONG LEE and potentially others involved in similar iterations of LEE's scheme) are extremely relevant and important to this investigation.  In addition, based on my training and experience, many individuals utilize their telephones to access banking apps and other financial apps (such as Square or cryptocurrency-related sites), and thereby may provide evidence of other bank accounts or applications through which LEE has moved or stored money.

        c.  As to the LEE'S VEHICLE, as noted above, based on my training and experience, digital devices (phones and other storage devices) can be stored in vehicles, and if LEE is riding a bicycle at the time of detention, he may have stowed his phone or other electronic storage devices in a pouch or other storage area affixed to the bicycle while he is riding.

d.   As to OK BAIL BOND, as noted in the previous sections, LEE has been known to conduct elements of the bail scheme (for example, explaining the scheme to KIM and talking him into participating) at OK BAIL BOND.  In addition, certain files associated with each arrestee bailed out by a bail agent have to be maintained by the bail agent per California Code of Regulations Title 10 Section 2100 (Necessary Record; Open to Inspection) for inspection by the commissioner or commissioner's representative at the principal place of business of the licensee.  These bail files likely contain evidence of LEE's scheme in the form of any and all forms, photos and other information gathered by LEE in South Korea to support his 1305(g) motions.  LEE has to obtain an identification from a local police officer, and present the individual for extradition prior to submitting a 1305(g) motion.  In the cases where this scheme came to fruition, it would be expected those files would contain such information, and could lead to identification and evidence of further iterations of the scheme.  In addition, information from the Confidential Human Source indicates LEE maintains a ledger of his financial transfers, which, based on my training and experience, would be kept in a location controlled by LEE, namely his business, his residence or his safe deposit box (noted below).

e.   As to LEE'S RESIDENCE, the Confidential Human Source stated that LEE maintained a home office in the past, and because he has not moved, there is no reason to think the home office does not still exist as noted by the Confidential Human Source.  Also, as noted above, based on my training and

experience, LEE likely keeps electronic devices such as computers and phones in his residence.  Finally, since other employees have access to the files and computers at OK BAIL BOND, it is logical to think that LEE may maintain sensitive documents such as a ledger at his home office so only he has access to them.

f.   As to LEE'S SAFE DEPOSIT BOX, based on Confidential Human Source information, LEE maintains a safe deposit box.  Investigation has corroborated that, though he has closed down his accounts with Comerica Bank, LEE continues to maintain a "self-serve security box" at the Koreatown branch of Comerica Bank.  Comerica Bank does not maintain any records of access for this box, but confirmed LEE is still in possession of it as of August 30, 2021.  Based on my training and experience, safe deposit boxes are maintained when someone wants a secure place to store things (such as ledgers and cash) that he or she does not want others, the bank or the government to track.  The Confidential Human Source thought LEE at one time maintained a ledger as well as cash in the safe deposit box.  Cash, ledgers, electronic storage devices, phones or other documents could be stored in LEE'S SAFE DEPOSIT BOX.

C.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

1          a.   Forensic methods may uncover electronic files or

2     remnants of such files months or even years after the files have

3     been downloaded, deleted, or viewed via the Internet.  Normally,

4     when a person deletes a file on a computer, the data contained

5     in the file does not disappear; rather, the data remain on the

6     hard drive until overwritten by new data, which may only occur

7     after a long period of time.  Similarly, files viewed on the

8     Internet are often automatically downloaded into a temporary

9     directory or cache that are only overwritten as they are

10    replaced with more recently downloaded or viewed content and may

11    also be recoverable months or years later.

12         b.   Digital devices often contain electronic evidence

13    related to a crime, the device's user, or the existence of

14    evidence in other locations, such as, how the device has been

15    used, what it has been used for, who has used it, and who has

16    been responsible for creating or maintaining records, documents,

17    programs, applications, and materials on the device.  That

18    evidence is often stored in logs and other artifacts that are

19    not kept in places where the user stores files, and in places

20    where the user may be unaware of them.  For example, recoverable

21    data can include evidence of deleted or edited files; recently

22    used tasks and processes; online nicknames and passwords in the

23    form of configuration data stored by browser, e-mail, and chat

24    programs; attachment of other devices; times the device was in

25    use; and file creation dates and sequence.

26         c.   The absence of data on a digital device may be

27    evidence of how the device was used, what it was used for, and

28    who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

36.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

37. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of

34

the warrant: (1) depress LEE's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LEE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

38.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

D.  **INTERSTATE AND FOREIGN NEXUS**

39.  In my training and experience, virtually every transaction involving a financial institution involves an interstate wire, even when money is moved strictly within the same state.  This is because bank branches must report their activities to their headquarters and data storage centers, among other places, which are commonly located in other states.  In this case, the wires observed between YONG LEE, LEE and attorney K.K. likely involved interstate wires as noted above.  In addition, the information transmitted from LEE while in South Korea to the law enforcement agencies in the United States regarding CHOI and KIM crossed international lines in support of his fraud scheme, and the financial wire from attorney K.K. to Dong-Jin Choi crossed international lines when money was sent from the United States to South Korea, which satisfies the foreign commerce portion of the wire fraud statute.

**VII. CONCLUSION**

40.  For all the reasons described above, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described in Attachment B, will be found in a

search of LEE, the TARGET PHONE, the LEE'S VEHICLE, the LEE'S

RESIDENCE, OK BAIL BOND, and the LEE'S SAFE DEPOSIT BOX.


_____
KELLY M. SULLIVAN, Special Agent
Federal Bureau of Investigation


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this ____ day of October,
2021.


_____
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

# EXHIBIT 1

Case: 196D-LA-3387242

Title: Ju Lee Payments Flow Chart

Classification: UNCLASSIFIED//FOUO



Alleeance Service Group Inc.
DBA Ok Bail Bonds
Pacific City Bank 1434612

$541,140.00
Post Date: 2/26/2021

Law Offices of Keith K Kim
Bank of Hope 8021855902

International Wire 3/12/2021:
$400,000.00

Dong Jin Choi

Owner

Lee Sang Won

Owner

$541,140.00
Post Date: 11/23/2020

Alleeance Service Group Inc.
DBA Ok Bail Bonds
Pacific City Bank 1431493

Outgoing Wire
11/23/2020
$120,000.00

Bail USA Inc.

$55,340.00
Post Date: 11/5/2020

$94,400.00
Post Date: 11/4/2020

$205,000.00
Post Date: 11/4/2020

$16,400.00
Post Date: 11/5/2020

$18,700.00
Post Date: 11/5/2020

Cashier's Check Disbursement
$411,300.00
Post Date: 11/9/2020

Yong Joo Lee
JPMC 9575

Reliance Investment
JPMC 7926 (Yong Joo Lee)

Reliance Investment
Woori Bank 3108 (Yong Joo Lee)

Yong Joo Lee
Woori Bank 9489

Yong Joo Lee
Citibank 8252

$93,000.00
Post Date: 11/2/2020

$202,428.17
Post Dates: 10/29 & 11/2/2020

$15,000.00
Post Dates: 10/29 & 10/30/2020

$15,000.00
Post Dates: 10/29 & 10/30/2020

$165,000.00
Post Dates: 11/2/2020 & 11/4/2020

$245,900.00
Post Date: 11/4/2020

[Suspected PMTS from Ju Lee]
$246,000.00
Post Date: 11/2/2020

Ju Lee

Yong Joo Lee
Citibank 9572

**Total Paid to Yong Joo Lee from Ju Lee**
**(Includes Suspected Payments): $736,428.17**

**Total Paid to Lee Sang Won from Yong Joo Lee:**
**$745,800.00**

**Total Paid to Lee Sang Won from Ju Lee:**
**$55,340.00**

Author: FoA Wilson Guo

Author: FoA Wilson Guo